ORDERED.

**Dated:  June 08, 2020**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 8:19-bk-04971-MGW |
| | Chapter 11 |
| Gateway Radiology Consultants, P.A., | |
|     Debtor. | |
| _____/ | |
| Gateway Radiology Consultants, P.A., | Adv. No. 8:20-ap-00330-MGW |
|     Plaintiff, | |
| v. | |
| Jovita Carranza, in her capacity as Administrator for the U.S. Small Business Administration, et al., | |
|     Defendants. | |
| _____/ | |

## MEMORANDUM OPINION ON CHAPTER 11 DEBTOR'S ELIGIBLITY FOR PAYCHECK PROTECTION PROGRAM LOANS

Because of the economic uncertainty caused by COVID-19, more than 20

million Americans have lost their jobs. To keep American workers employed, and to

make sure they get paid, Congress passed the CARES Act, the largest stimulus package in history. At the heart of the CARES Act is the Paycheck Protection Program, which provides hundreds of billions of dollars in funding to small businesses to cover payroll, mortgage interest, rent, and utility costs.

Although referred to as PPP "loans," the Paycheck Protection Program functions like a grant. So long as a PPP borrower uses the "loan" for covered expenses (payroll, mortgage interest, rent, and utilities) the entire "loan" is forgiven. Because the loans are designed to be forgiven, both Congress and the SBA Administrator have dispensed with the underwriting typically required for SBA loans.

Even so, the SBA has promulgated a rule disqualifying debtors from participating in the Paycheck Protection Program because they supposedly pose an unacceptably high risk of using PPP "loans" for noncovered expenses, as well as an unacceptably high risk of not repaying any unforgiven amounts. Gateway Radiology Consultants, P.A., a chapter 11 debtor, asks the Court to enjoin the SBA Administrator from disqualifying it from participating in the Paycheck Protection Program.

The Court concludes that the SBA Administrator exceeded her authority when she promulgated the rule disqualifying Gateway Radiology from the Paycheck Protection Program. In order for a borrower to be eligible for a PPP Loan, Congress could have required borrowers to certify that they are not in bankruptcy. But Congress chose not to. By engrafting onto the Paycheck Protection Program a

requirement that Congress chose not to insist on, the SBA Administrator exceeded her statutory authority.

Even if the SBA Administrator had not exceeded her authority, the rule disqualifying Gateway Radiology from participating in the Paycheck Protection Program is arbitrary and capricious because:

- the SBA Administrator considered factors Congress did not intend her to consider (i.e., collectability);

- the SBA Administrator failed to consider an important aspect of the problem (i.e., how the bankruptcy process promotes the same public policy as the CARES Act and how it makes it unlikely a chapter 11 debtor will use a PPP "loan" for noncovered expenses); and

- the SBA Administrator's explanation for her rule is contrary to the evidence before her (i.e., chapter 11 debtors are less likely to use PPP "loans" for noncovered expenses and more likely to repay PPP "loans").

The Court will therefore enjoin the SBA Administrator from disqualifying Gateway Radiology from participating in the Payroll Protection Program.

# I.   BACKGROUND[1]

## A.   COVID-19 caused the loss of more than 20 million jobs and threatened the loss of millions more.

On March 13, 2020, the President declared a national emergency.[2] Just three months earlier, Chinese officials detected an outbreak of a novel strain of coronavirus (known as COVID-19) in Wuhan, China.[3] The disease quickly spread to the United States and other countries. By mid-March, when the President declared a national emergency, the United States had almost 2,000 confirmed COVID-19 cases,[4] and the disease's rapid spread—thousands of new cases were being reported each day—was threatening to strain the nation's healthcare system.[5]

---

[1] The background section of this opinion recounts the fallout from the COVID-19 pandemic. Under Federal Rule of Evidence 201, the Court may, on its own, take judicial notice of facts that are generally known within its territorial jurisdiction or facts that can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b), (c). That includes publicly available data, such as labor statistics. *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 806 (E.D. Wis. 2019). It can also include other statistics compiled by government agencies, such as the number of COVID-19 cases when the parties don't dispute the number (or, if they do, the existence of publications containing the number of cases) and public statements about COVID-19, such as the President's declaration of a national emergency. *McGhee v. City of Flagstaff*, 2020 WL 2309881, at *3 – 4 (D. Ariz. May 8, 2020).

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[3] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[5] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

To keep our country's healthcare system from being overwhelmed, and to stem the tide of what had become a global pandemic, the United States started implementing social distancing measures. Those measures included statewide Stay-at-Home orders; closing schools; closing non-essential businesses; banning large gatherings; and limiting restaurants to takeout or delivery.[6] While necessary to "flatten the curve,"[7] the social distancing measures came with a cost.

Personal consumption in March 2020 fell by 7.5%—the largest recorded drop in history.[8] And nonfarm employment dropped by almost 900,000 jobs, before plummeting by more than 20 million jobs in April.[9] Those job losses were widespread: the leisure and hospitality industry lost 7.7 million jobs (almost half the industry), while the education and health services industry; the professional and business services industry; and the retail trade industry each lost more than 2 million

---

[6] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[7] "The term "flatten the curve," originating from the Centers for Disease Control and Prevention, has been used widely to describe the effects of social distancing interventions." Laura Matrajt & Tiffany Leung, *Evaluating the Effectiveness of Social Distancing Interventions to Delay or Flatten the Epidemic Curve of Coronavirus Disease*, Emerging Infectious Diseases, August 2020, *available at* https://wwwnc.cdc.gov/eid/article/26/8/20-1093_article#r26.

[8] https://www.bea.gov/news/2020/personal-income-and-outlays-march-2020; *see also* Carlie Porterfield, *U.S. Consumer Spending Sees Sharpest Monthly Drop Ever Recorded*, Forbes, Apr. 30, 2020, *available at* https://www.forbes.com/sites/carlieporterfield/2020/04/30/us-consumer-spending-sees-sharpest-monthly-drop-ever-recorded/#469a619420da ("Consumer spending—which drives around 70% of the U.S. economy—dropped by 7.5% in March, the steepest drop in history since records began being kept in 1959 according to the U.S. Commerce Department, as businesses close, layoffs abound and Americans shelter-in-place during the coronavirus pandemic").

[9] https://www.bls.gov/news.release/empsit.nr0.htm.

jobs.[10] As a result, the unemployment rate skyrocketed from 4.4% to 14.7%—the largest single-month increase in history.[11]

### B. Congress provided nearly $350 billion in funding for forgivable loans so small businesses could make payroll.

To provide emergency relief to American workers and small businesses, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").[12] Although the CARES Act was intended, in part, to help American workers who had already lost their job, much of the $2 trillion in relief provided for under the CARES Act was intended to preserve American jobs.[13] Two of the ways it did so are relevant here.

First, as part of a $454 billion relief package, Congress directed the Treasury Department to provide financing to lenders who make direct loans to mid-size businesses (businesses with between 500 and 10,000 employees).[14] In exchange for

---

[10] https://www.bls.gov/news.release/empsit.nr0.htm.

[11] https://www.bls.gov/news.release/empsit.nr0.htm.

[12] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

[13] *Id.* at §§ 1102, 4003; *see also* 166 Cong. Rec. E349-04 (daily ed. Mar. 27, 2020) (speech of Rep. McHenry) ("My ultimate goal for this legislation is to keep Americans employed. Specifically, this bill will provide relief to our small businesses to help them keep employees on payroll and prepare those businesses to be up and running as soon as America is open for business again"); 166 Cong. Rec. E339-01 (daily ed. Mar. 27, 2020) (speech of Rep. Jayapal) ("One of the most important things I heard from my district was the pain and suffering of small business owners and non-profits of all sizes. The CARES Act creates a Payment Protection Program that helps businesses keep workers on payroll, through $350 billion in forgivable loans that can also be used for payroll, rent, utilities, and other necessary costs that will help small businesses weather the crisis.").

[14] CARES Act, Pub. L. No. 116-136, § 4003(b)(4), 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9042).

favorable repayment terms, borrowers have to agree to retain or restore 90% of their

workforce.[15] To be eligible for the mid-size loan program, a borrower has to certify

(among other things) that it is not a debtor in bankruptcy.[16]

Second, for small businesses (those with 500 employees or fewer), Congress

initially provided $349 billion in funding for the Paycheck Protection Program.[17]

Under the Paycheck Protection Program, eligible small businesses can borrow up to

two and a half times their average monthly payroll.[18] The loan proceeds can be used

to pay:

- payroll costs;
- group health benefits and insurance premiums; and
- mortgage interest, rent, and utilities.[19]

Although the Paycheck Protection Program refers to the financing as a "loan,"

in all respects it operates as a grant. That's because the Paycheck Protection Program

provides generous loan forgiveness: if the borrower uses the loan proceeds for payroll

---

[15] *Id.* at § 4003(c)(3)(D).

[16] *Id.* at § 4003(c)(3)(D)(i)(V).

[17] *Id.* at §§ 1102, 1107; *see also DV Diamond Club of Flint, LLC v. U.S. SBA*, 2020 WL 2315880, at *3 (E.D. Mich. May 11, 2020) ("The SBA quickly exhausted the initial $349 billion in loan guarantees, and Congress then appropriated an additional $310 billion for loan guarantees under the PPP.") (citing The Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1)." *Id.*

[18] 15 U.S.C. § 636(a)(36)(E).

[19] 15 U.S.C. § 636(a)(36)(F)(i). The proceeds can also be used to pay interest on certain debt obligations incurred before February 15, 2020. *Id.*

and other approved expenses (referred to as "covered expenses"), the entire loan will be forgiven.[20]

Congress imposed few requirements on borrowers and lenders participating in the Paycheck Protection Program. To be eligible for a PPP Loan, a borrower need only be a small business concern or a nonprofit organization, veterans organization, or Tribal business concern with fewer than 500 employees.[21] When applying for a PPP Loan, a borrower must also certify that:

- because of the economic uncertainty caused by COVID-19, the business needs the PPP Loan for its ongoing operations;
- the business will use the PPP Loan proceeds to retain workers and maintain payroll or make mortgage interest, lease, and utility payments; and
- between February 15, 2020 and December 31, 2020, the business has not and will not receive another PPP Loan.[22]

Unlike it does for the mid-size loan program, the CARES Act does not require a small business applying for a PPP Loan to certify that it is not a debtor in bankruptcy.

In deciding whether to approve a PPP Loan, SBA lenders need only consider two criteria: (1) Was the borrower operating on February 15, 2020?; and (2) Did the employer have employees for whom it paid salaries and payroll taxes (or did it have

---

[20] CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 9005). The bulk of the loan proceeds, though, must be used for payroll: no more than 25% of the amount forgiven may be for non-payroll expenses.

[21] 15 U.S.C. § 636(D).

[22] 15 U.S.C. § 636(G)(i)(I) – (IV).

paid independent contractors)?[23] Congress did not direct SBA lenders, to whom Congress delegated the SBA Administrator's authority to make and approve PPP Loans, to consider whether a borrower was in bankruptcy.[24]

### C.   Congress authorizes the Small Business Administration to implement the Paycheck Protection Program.

More than 65 years ago, Congress created the Small Business Administration to aid, assist, and protect the interests of small businesses.[25] Because the country's security and economic well-being hinges on maximizing the potential of small businesses,[26] Congress has committed to using all reasonable means to create and sustain programs that promote investment in small businesses—including investments that expand employment opportunities.[27]

This is mainly accomplished by the SBA providing financial assistance to small businesses—in the form of direct loans, joint loans with a lender, or loan guarantees—under § 7(a) of the Small Business Act. Under § 7(a), loans must be of "such sound value or so secured as reasonably to assure repayment."[28]

---

[23] 15 U.S.C. § 636(F)(ii)(II).

[24] *Id.*

[25] 15 U.S.C. § 631(a) (declaring that "[i]t is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise").

[26] *Id.*

[27] 15 U.S.C. § 631a(b).

[28] 15 U.S.C. § 636(a)(6).

To determine whether a loan is sound, the SBA ordinarily considers the following criteria set forth in 13 C.F.R. § 120.150: the applicant's character, reputation, and credit history; the experience and depth of management; the strength of the business; past earnings, projected cash flow, and future prospects; the ability to repay the loan with business earnings; whether the business has sufficient equity to operate on a sound basis; the potential for long-term success; and the nature and value of collateral securing the loan.[29]

When Congress passed the CARES Act, it placed the Paycheck Protection Program under § 7(a) of the Small Business Act and authorized the Administrator to issue regulations to carry out the Paycheck Protection Program.[30]

### D. The SBA Administrator's interim final rule clarified that PPP Loans do not require underwriting.

On April 15, 2020, the Administrator promulgated an interim final rule for the Paycheck Protection Program. As you might expect in the case in which a loan is designed to be forgiven, the SBA's interim final rule clarified that its normal underwriting guidelines have gone by the wayside for PPP Loans:

> [F]or loans made under the PPP, SBA will not require the lenders to comply with section 120.150.[31]

---

[29] 13 C.F.R. § 120.150.

[30] CARES Act, Pub. L. No. 116-136, § 1102(a), 134 Stat. 281 (2020).

[31] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

Under the SBA's interim final rule, lenders need only do five things to underwrite a PPP Loan: (1) confirm receipt of the borrower's certifications; (2) confirm receipt of information showing that a borrower had employees for whom the employer paid salaries and payroll taxes; (3) confirm the dollar amount of the business' average monthly payroll costs; (4) follow Bank Secrecy Act requirements; and (5) review the "Paycheck Protection Application Form."[32] That's it.

The interim final rule also confirmed the CARES Act's minimal certification requirements for PPP Loans. Like the CARES Act, the SBA's interim rule did not require borrowers to certify that they were not involved in a bankruptcy case.

### E. The SBA decides that debtors are ineligible for PPP Loans.

On April 28, 2020, the SBA issued another interim final rule supplementing its previous one ("Supplemental Rule"). In the Supplemental Rule, the SBA declared for the first time that debtors in bankruptcy are ineligible for PPP Loans.[33] The SBA's meager justification for the Supplemental Rule's new eligibility requirement was that debtors are more likely to use a PPP Loan for noncovered expenses and less likely to be able to repay an unforgiven loan:

> The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven

---

[32] *Id.* at 20,815.

[33] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

loans. In addition, the Bankruptcy Code does not require
any person to make a loan or a financial accommodation
to a debtor in bankruptcy. . . .[34]

### F.   Even though Gateway Radiology is in bankruptcy, its PPP Loan Application was approved.

Gateway Radiology Consultants operates an outpatient imaging, diagnostic, and interventional radiology center in St. Petersburg, Florida.[35] In May 2019, Gateway Radiology was forced into chapter 11 bankruptcy because of a failed expansion in Lake Wales, which snowballed into litigation with its medical equipment supplier, as well as its primary lender. A year after filing for bankruptcy, Gateway Radiology applied online for a PPP Loan through USF Federal Credit Union.

The first question on the PPP Loan application asked whether Gateway Radiology was in bankruptcy. Gateway Radiology claims it answered "yes." But Gateway Radiology says when it received a hard copy of its PPP Loan application to sign, it discovered the answer to the first question had been changed to "no." It says the Credit Union admitted that one of its employees had to "upload the application," with the implication being a Credit Union employee changed the answer to Question No. 1. For its part, the Credit Union provided an audit summary that appears to

---

[34] *Id.*

[35] Doc. No. 2 at 1 – 2.

show that Gateway Radiology incorrectly answered that it was not involved in a bankruptcy proceeding.[36]

The Court need not decide whether Gateway Radiology truthfully answered Question No. 1. It's irrelevant to the ultimate issue this Court must decide. Suffice it to say the Credit Union approved Gateway Radiology's PPP Loan application in the amount of $527,710 based on its mistaken understanding that Gateway Radiology was not in bankruptcy.

### G.    The SBA objects to Gateway Radiology's PPP Loan.

Two weeks later, Gateway Radiology asked the Court to approve the PPP Loan under Bankruptcy Code § 364, which requires a debtor to obtain court approval of postpetition financing outside the ordinary course of business.[37] In its postpetition financing motion, Gateway Radiology explained that it needs the PPP Loan proceeds to fund its operations. Gateway Radiology represented that it intended to use the loan proceeds for covered—i.e., forgivable—expenses.[38]

Although the SBA did not object to Gateway Radiology applying for a PPP Loan or otherwise obtaining postpetition financing, it did object to the entry of any order finding that Gateway Radiology is eligible to participate in the Paycheck Protection Program, that the loan approved by the Credit Union is entitled to loan

---

[36] Adv. Doc. No. 9-1.

[37] 11 U.S.C. § 364.

[38] Doc. No. 238 at ¶ 9.

forgiveness, or that the SBA is required to guarantee the loan.[39] According to the SBA Administrator, the Supplemental Rule bars Gateway Radiology from obtaining a PPP Loan because Gateway Radiology is a debtor in bankruptcy.

## II.   CONCLUSIONS OF LAW

Gateway Radiology filed this proceeding seeking a declaration that the Supplemental Rule is unenforceable for three reasons: First, Gateway Radiology contends that the SBA Administrator exceeded her authority in promulgating the Supplemental Rule.[40] Second, even if the SBA Administrator did not exceed her authority, Gateway Radiology contends that the Supplemental Rule is arbitrary and capricious.[41] Third, Gateway Radiology contends that the Supplemental Rule violates Bankruptcy Code § 525, which generally forbids a governmental entity from discriminating against a person because the person is a debtor in bankruptcy.[42] Because it contends that the Supplemental Rule is unenforceable, Gateway Radiology asks the Court to enjoin the SBA Administrator from enforcing the Supplemental Rule to the extent that it disqualifies Gateway Radiology from obtaining PPP Loans.[43]

---

[39] Doc. No. 249.

[40] Adv. Doc. No. 3 at ¶¶ 13, 29.

[41] Id. at ¶¶ 13.

[42] Id. at ¶¶ 19 – 21.

[43] Id. at ¶¶ 29.

The SBA Administrator maintains that injunctive relief is inappropriate for two reasons.[44] First, as a threshold matter, the SBA Administrator says sovereign immunity bars this Court from enjoining her from enforcing the Supplemental Rule. Second, the SBA Administrator says Gateway Radiology cannot show a substantial likelihood of success on the merits of its claims; that it will suffer irreparable harm if the Court does not enjoin the SBA Administrator from enforcing the Supplemental Rule; or that enjoining enforcement of the Supplemental Rule would promote the public interest. The Court disagrees.

### A.    Sovereign immunity does not bar this Court from enjoining the SBA Administrator from enforcing the Supplemental Rule.

There is no question that when Congress created the SBA, it waived sovereign immunity so that the SBA "could sue and be sued."[45] But there was a caveat: even though Congress provided that the SBA could sue or be sued, 15 U.S.C. § 634(b)(1)

---

[44] The SBA also raises a third reason—lack of standing. According to the SBA Administrator, Gateway Radiology merely seeks an order requiring her to find that Gateway Radiology cannot be excluded from the Paycheck Protection Program. Because the Credit Union has approved the loan, Gateway Radiology has not been excluded from the Paycheck Protection Program. Thus, the SBA Administrator reasons, Gateway Radiology has suffered no injury-in-fact. That argument borders on frivolous. The loan that was approved is eligible for loan forgiveness and is guaranteed by the SBA. Unless the SBA Administrator is willing to stipulate that Gateway Radiology's PPP Loan is guaranteed by the SBA and eligible for loan forgiveness, which so far she has been unwilling to do, then the Credit Union will not unfreeze the loan proceeds. It is self-evident, then, that Gateway Radiology has suffered an injury-in-fact. The SBA Administrator's standing argument deserves no further discussion.

[45] 15 U.S.C. § 634(b)(1) (providing that "[i]n the performance of, and with respect to, the functions, powers, and duties vested in [her] by this chapter the Administrator may . . . sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy").

provides that "no attachment, *injunction*, garnishment, or other similar process . . .

shall be issued against the Administrator."[46]

At first glance, § 634(b)(1) appears plain and unambiguous. "No injunction"

means no injunction. And many courts have read § 634(b)(1) that way.[47] But that

view is far from universal.[48] Indeed, courts are split over whether the scope of the

"no injunction" language in § 634(b)(1). Some courts hold that § 634(b)(1) bars

injunctions in all circumstances, while other courts hold that § 634(b)(1) does not bar

a court from enjoining an agency that has exceeded its statutory authority.[49]

So far, the Eleventh Circuit has not weighed in on the debate. But, according

to the SBA, the Fifth Circuit has twice held—first in *Romeo v. U.S.*[50] and later in

---

[46] *Id.* (emphasis added).

[47] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) ("Some courts have read the wording in this way, and concluded that all injunctive relief directed at the SBA is absolutely prohibited.") (citing *Valley Constr. Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir. 1983); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975); *Romeo v. United States*, 462 F.2d 1036, 1038 (5th Cir. 1972), *cert. denied*, 410 U.S. 928 (1973); *Expedient Servs., Inc. v. Weaver*, 614 F.2d 56, 58 (5th Cir. 1980); *Jets Servs., Inc. v. Hoffman*, 420 F. Supp. 1300, 1308–09 (M.D. Fla. 1976)).

[48] *Ulstein Maritime*, 833 F.2d at 1056 ("However, other courts have found that § 634(b)(1) does not bar injunctions in all circumstances.") (citing *Cavalier Clothes v. United States*, 810 F.2d 1108, 1112 (Fed. Cir. 1987); *Okla. Aerotronics v. United States*, 661 F.2d 976, 977 (D.C. Cir. 1981); *Related Indus. v. United States*, 2 Cl. Ct. 517, 522 (1983); *Dubrow v. SBA*, 345 F. Supp. 4, 7 (C.D. Cal. 1972)).

[49] *DV Diamond Club of Flint, LLC v. U.S. SBA*, 2020 WL 2315880, at *3 – 4 (E.D. Mich. May 11, 2020) (ruling that the "Court is persuaded that injunctive relief is available to Plaintiffs" because "Plaintiffs here seek only to 'set aside unlawful agency action'"); *Camelot Banquet Rooms, Inc. v. U.S. SBA*, 2020 WL 2088637, at *3 – 4 (E.D. Wis. May 1, 2020); *see also Elks Assocs. Funding Corp. v. U.S. SBA*, 858 F. Supp. 2d 1, 20 (explaining that courts in the D.C. Circuit "have strongly intimated that injunctive relief is available, at a minimum, when the SBA exceeds its statutory authority").

[50] 462 F.2d 1036, 1038 (5th Cir. 1972).

*Expedient Services, Inc. v. Weaver*[51]—that § 634(b)(1) bars plaintiffs from suing the SBA for injunctive relief. Because *Romeo* and *Expedient Services* were both decided before October 1, 1981, those decisions would be binding on this Court under *Bonner v. City of Prichard, Alabama*, which held that Fifth Circuit cases decided before October 1, 1981 are binding on the Eleventh Circuit.[52]

While *Romeo* and *Expedient Services* are binding precedent, neither decided the narrow issue here: does § 634(b)(1) bar a court from enjoining an agency from exceeding its statutory authority? In fact, the *Expedient Services* Court acknowledged it sidestepped that issue:

> As pointed out by the plaintiff, there are some decisions indicating that injunctive relief against the Administrator may be available when he exceeds his authority. *However, it is not necessary for us to decide this issue* because the Administrator clearly did not exceed his authority under 15 U.S.C. § 637(a).[53]

Thus, this Court is not bound by *Romeo* and *Expedient Services*.

---

[51] 614 F.2d 56, 58 (5th Cir. 1980).

[52] 661 F.2d 1206, 1209 (11th Cir. 1981) ("To decide this case, and later Eleventh Circuit cases, we must decide whether this court shall adopt some established body of law as its body of precedent, and if so, effective as of its coming into existence, what established body of law will be chosen. For several reasons we choose the decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date. We consider that body of law worthy for governance of legal affairs within the jurisdiction of this new circuit.") (footnote omitted).

[53] *Expedient Servs.*, 614 F.2d at 58 n.2 (citations omitted) (emphasis added).

Writing on a clean slate, this Court concludes that § 634(b)(1) does not bar this Court from enjoining the SBA Administrator from exceeding her statutory authority for two reasons.

First, § 634's legislative history confirms that Congress did not intend the statute to have such a broad scope. The First Circuit, in *Ulstein Maritime, Ltd. v. United States*, did yeoman's work tracing the origin of § 634(b)(1)'s "no injunction" language back 80 years to the Supreme Court's decision in *Federal Housing Administration v. Burr.*[54]

There, the Supreme Court considered whether an employee could garnish the FHA to collect on a judgment for unpaid wages.[55] At the time, the National Housing Act provided that the FHA Administrator was authorized "to sue and be sued in any court of competent jurisdiction."[56] "Sue and be sued," the Supreme Court said, must be given its ordinary meaning, which would "embrace all civil process," including garnishments.[57] Because Congress had established an agency, authorized it to engage in commercial transactions, and permitted it to sue or be sued, the Supreme Court

---

[54] 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that the "origin and purpose of the language in § 634(b)(1) goes back to the decision in *FHA v. Burr*").

[55] *FHA v. Burr*, 309 U.S. 242, 243 (1940) ("The question presented here is whether the Federal Housing Administration is subject to garnishment for moneys due to an employee.").

[56] *Id.* at 244 (explaining that Congress amended the National Housing Act in 1935 by "by adding thereto the provision that 'The Administrator shall, in carrying out the provisions of this title and titles II and III, be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.'").

[57] *Id.* at 245.

was unwilling to assume Congress implicitly limited the meaning of "sue and be sued" to preclude garnishments.[58] Had Congress intended to prohibit the FHA from being garnished, the Supreme Court reasoned, Congress would have said so.

After *Burr*, Congress added language like that found in § 634(b)(1)—language barring attachment, injunctions, garnishments, and other similar process—to enabling statutes for other agencies.[59] The legislative history for these other statutes— for example, ones creating the Federal Crop Insurance Corporation and Commodity Credit Corporation—clarifies that Congress added the language to prevent creditors and others from interfering with an agency's operations by suing the agency and then attaching its funds.[60] As the First Circuit points out, there is no indication Congress intended to give the SBA any broader immunity than it did to other agencies.[61]

Second, it would have been absurd for Congress to have intended to bar courts from enjoining agencies that have exceeded their statutory authority. Were that the case, courts would be powerless to stop a constitutional violation:

> [Section 634(b)(1)] was not intended to render the agency
> immune from injunctive relief in situations where the
> agency has exceeded its statutory authority and where an

---

[58] *Id.*

[59] *Ulstein Maritime, Ltd. v. U.S.*, 833 F.2d 1052, 1056 (1st Cir. 1987) (explaining that "language such as that in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds and other interference with agency functioning").

[60] *Id.* ("While the specific legislative history of § 634(b)(1) is silent on the purpose of this language, the legislative history of earlier statutes containing the identical wording indicates that it was intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds.").

[61] *Id.* at 1057.

> injunction would not interfere with the agency's internal
> operations. Indeed, if provisions such as § 634(b)(1) meant
> that the agency could never be enjoined, then an agency
> could adopt unconstitutional policies and continue to
> follow them even after a court declared them
> unconstitutional. For example, the SBA could adopt a
> policy stating that it will extend small business loans only
> to companies owned by white men. If § 634(b)(1) means
> that the SBA may never be enjoined, then a court could
> not enjoin this policy, even though it would be blatantly
> unconstitutional.[62]

The Supreme Court has instructed courts to avoid interpreting statutes in a way that would produce absurd results if there is an alternative interpretation that is consistent with the legislative purpose.[63] Here, there is an interpretation of § 634(b)(1) that is consistent with the legislative purpose (i.e., preventing creditors from interfering with an agency's internal workings) yet does not lead to an absurd result (rendering courts powerless to enjoin unlawful action): § 634(b)(1) does not bar this Court from enjoining the SBA Administrator from exceeding her  statutory authority.

### B.    Gateway Radiology is entitled to enjoin the SBA Administrator from enforcing the Supplemental Rule.

To enjoin the SBA Administrator from enforcing the Supplemental Rule, Gateway Radiology must show that (1) it has a substantial likelihood of success on the merits of its claims; (2) it will suffer irreparable harm if the Court does not enjoin

---

[62] *Camelot Banquet Rooms, Inc. v. SBA*, 2020 WL 2088637, at *4 (E.D. Wis. May 1, 2020) (citations omitted).

[63] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

the SBA Administrator from enforcing the Supplemental Rule; (3) the harm it will suffer if the Court does not grant injunctive relief outweighs the harm the SBA will suffer if the Court does; and (4) enjoining the SBA from enforcing the Supplemental Rule is not adverse to the public interest.[64] Gateway Radiology has carried its burden here.

### 1.    Gateway Radiology has a substantial likelihood of success on the merits.[65]

The Administrative Procedure Act authorizes this Court to find that the SBA's Supplemental Rule is unlawful—and therefore may be set aside—on any one of six enumerated grounds.[66] Grounds for setting aside the Supplemental Rule include where the SBA Administrator exceeded her authority in promulgating the Supplemental Rule and where the Supplemental Rule is arbitrary and capricious.[67] Both grounds are present here.

---

[64] *Harbourside Place, LLC v. Town of Jupiter, Florida*, 958 F.3d 1308, 1313 – 14 (11th Cir. 2020).

[65] Gateway Radiology has challenged the Supplemental Rule on three grounds. First, Gateway Radiology says the SBA Administrator exceeded her authority in promulgating the Supplemental Rule. Second, Gateway Radiology says the Supplemental Rule is arbitrary and capricious. Third, Gateway Radiology says the Supplemental Rule violates Bankruptcy Code § 525. Because Gateway Radiology has substantial likelihood of success on the first two grounds, the Court declines to address the third ground—that the Supplemental Rule violates Bankruptcy Code § 525—on a preliminary basis.

[66] 5 U.S.C. § 706(2)(A) – (F) (providing that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions that are found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence in a case subject to 5 U.S.C. §§ 556 and 557; or unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court).

[67] *Id.* at § 706(2)(A), (C).

### a.   The SBA Administrator exceeded her authority when she promulgated the Supplemental Rule.

The SBA Administrator says that this Court, in determining whether she exceeded her statutory authority, must be guided by *Chevron*'s two-step framework.[68] Under the two-step *Chevron* framework, this Court would first ask whether the statute at issue is ambiguous; if it is, this Court would then ask whether the agency's interpretation of the statute is reasonable.[69] The *Chevron* framework presumes that when a statute is ambiguous, Congress must have implicitly delegated to the agency the authority to fill in the statutory gaps.[70]

The Supreme Court, however, has recognized that in extraordinary cases, courts should hesitate to find that Congress implicitly delegated authority to an agency to fill in statutory gaps.[71] Take, for example, the Supreme Court's decision five years ago in *King v. Burwell*.[72]

*King* involved a challenge to the Affordable Care Act. One of the Affordable Care Act's key reforms was the creation of "exchanges"—marketplaces that allowed

---

[68] Adv. Doc. No. 11 at 20.

[69] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 – 43 (1984).

[70] *Id.* at 843 ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.").

[71] *King v. Burwell*, 135 S. Ct. 2480, 2488 – 89 (2015) ("'In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation.' This is one of those cases.").

[72] *Id.*

people to compare and buy insurance plans. The Affordable Care Act required states to create their own exchanges. If a state refused to do so, the Affordable Care Act required the federal government to create one.

The Affordable Care Act then provided tax credits to taxpayers to buy insurance plans—but only for taxpayers who bought an insurance plan through "an Exchange established by the State." Even though the Affordable Care Act limited tax credits to insurance plans bought through an exchange "established by the state," the IRS interpreted "an exchange established by the state" to mean an exchange established by the state or federal government. The petitioners in *King* challenged the IRS's interpretation.

After acknowledging that it often applies the *Chevron* two-step framework when analyzing an agency's interpretation of a statute, the Supreme Court concluded *King* was one of those extraordinary cases when it should decline to do so.[73] According to the Supreme Court, the tax credits were one of the Affordable Care Act's key reforms. Because the availability of credits involved billions of dollars in spending each year and affected the price of health insurance for millions of people, whether credits were available on federal exchanges was a "question of deep 'economic and political significance' that [was] central to [the] statutory scheme."[74]

---

[73] *Id.*

[74] *Id.* at 2489.

The Supreme Court concluded that "had Congress wished to assign that question to an agency, it surely would have done so expressly."[75]

So too here. Like the Affordable Care Act, the Paycheck Protection Program involves billions of dollars of spending ($349 billion to be precise). And, as with the interpretation of the eligibility for Affordable Care Act tax credits, how eligibility for PPP Loans is determined could affect millions of Americans. Here, like in *King*, it is unlikely that Congress intended to delegate a question of such "economic and political significance" to the SBA. Thus, it is for this Court to determine the correct reading of the CARES Act.

In determining the correct reading of the CARES Act, this Court must begin where the *King* Court did—with the language of the statute itself. If the statutory language is plain, courts must enforce it according to its terms.[76] To determine whether language is plain, courts must "read the words 'in their context and with a view to their place in the overall statutory scheme.'"[77] Here, reading the words of the CARES Act in context and with a view to the Paycheck Protection Program's place in the overall statutory scheme, it is plain Congress did not intend to exclude chapter 11 debtors from the Paycheck Protection Program.

---

[75] *Id.*

[76] *Id.* ("If the statutory language is plain, we must enforce it according to its terms.").

[77] *Id.* (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 133 (2000)).

Let's start with the context of the CARES Act. When Congress passed the CARES Act, the President had already declared a state of emergency because COVID-19 was threatening to strain the nation's healthcare systems; half the nation's states had implemented Stay-at-Home orders to "flatten the curve" in hopes of minimizing the strain on the nation's healthcare system; close to one million people had already lost their jobs; and millions more (more than 20 million, as it turns out) were about to lose theirs.

Now let's turn to the Paycheck Protection Program's place in the overall statutory scheme. In passing the CARES Act, Congress intended the Paycheck Protection Program to (among other things) help keep American workers employed and paid. Lest there be any doubt, Congress included the Paycheck Protection Program (as well as the mid-size loan program) in Title I of the CARES Act, which it named the "Keeping Workers Paid and Employed Act."[78]

Finally, let's consider the words of the CARES Act itself. In the CARES Act, Congress specified minimal—yet expansive—eligibility requirements for the Paycheck Protection Program. Under a subsection titled "*Increased Eligibility* for Certain Small Businesses and Organizations," Congress provided that any small business concern, other business concern, nonprofit organization, veterans

---

[78] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

organization, or Tribal business concern that has 500 employees or fewer "*shall be eligible*" for a PPP Loan.[79]

And Congress specified that all an eligible borrower needs to do to apply for a PPP Loan is to certify that the loan is necessary because of the economic uncertainty caused by COVID-19; the proceeds will be used to retain workers and make payroll or pay mortgage interest, lease, or utility payments; and the borrower has not or will not receive another PPP Loan.[80] Although it could have done so, Congress chose not to require borrowers to certify that they were not involved in a bankruptcy case when applying for a PPP Loan.[81]

It's also worth noting that Congress delegated the SBA Administrator's decision to make or approve PPP Loans to SBA lenders.[82] In delegating that authority to SBA lenders, Congress instructed lenders to consider only two factors when making or approving a PPP Loan: (1) Was the business operating on February 15, 2020? (2) Did the borrower have employees for whom it was paying salaries and payroll taxes?[83] Congress did not instruct SBA lenders—who are exercising authority

---

[79] 15 U.S.C. § 636(a)(36)(D)(i)(I) – (II).

[80] *Id.* at § 636(a)(36)(G)(i)(I) – (IV).

[81] *Id.*

[82] *Id.* at § 636(a)(36)(F)(ii)(I).

[83] *Id.* at § 636(a)(36)(F)(ii)(I) – (II)(bb).

delegated from the SBA Administrator—to consider whether a borrower is in bankruptcy.[84]

To recap, even though Congress specified who is eligible for PPP Loans, the criteria lenders must consider when approving a PPP Loan, and the certifications a borrower must make to obtain one, Congress did not disqualify chapter 11 debtors from being eligible for PPP Loans, insist that lenders determine whether a borrower is in bankruptcy before approving a PPP Loan, or require a borrower to certify that it isn't involved in a bankruptcy proceeding to obtain a PPP Loan. Congress' silence ought to be conclusive that Congress did not intend to exclude an entire class of small businesses—chapter 11 debtors—from the Paycheck Protection Program.

The SBA Administrator, however, claims Congress' silence authorizes her to engraft an additional eligibility requirement onto the Paycheck Protection Program.[85] Not so.

To see why that's not the case, consider the mid-size loan program. Unlike the Paycheck Protection Program, which functions like a grant, the mid-size loan program is a true loan program. Loans made under the mid-size program, unlike those made under the Paycheck Protection Program, cannot be forgiven. For the mid-size loan program, Congress required borrowers to certify that they are not a debtor in bankruptcy.

---

[84] *Id.*

[85] Adv. Doc. No. 11 at 21 – 23.

So Congress knew how to disqualify debtors from eligibility if it wanted to. Yet it chose not to do so for PPP Loans. As the SBA Administrator concedes, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion."[86] Because Congress chose not to require PPP Loan applicants to certify that they were not involved in a bankruptcy case, this Court concludes that Congress purposely chose not to disqualify chapter 11 debtors from the Paycheck Protection Program.[87]

That makes sense for (at least) two reasons. First, while a borrower's status as a debtor matters for the mid-size loan program, it does not for the Paycheck Protection Program because PPP Loans are designed to be forgiven. Second, the purpose of the Paycheck Protection Program was to keep American workers employed and paid. Chapter 11 debtors need PPP Loans as much, if not more than, other small businesses to retain workers and pay them.

---

[86] Adv. Doc. No. 11 at 20 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[87] The SBA Administrator argues that this conclusion is undermined by Congress' recent passage of the HEROES Act, which (among other things) makes critical-access hospitals eligible for PPP Loans "regardless of the status of such a hospital as a debtor" in a chapter 11 case. Adv. Doc. No. 11 at 23 n.11 (citing The Heroes Act, H.R. 6800, 116th Cong., § 9001(c) (2020)). The SBA says this language shows the House of Representatives believes additional legislation is required to make a specific subset of borrowers—chapter 11 debtors—eligible to apply for PPP Loans. *Id.* That's one way to read that language. It's equally, if not more, likely that the House of Representatives was clarifying its intent that—contrary to the Supplemental Rule—chapter 11 debtors are eligible for PPP Loans. In any event, the reference to debtors in the HEROES Act does not change the fact that in one section of the CARES Act (the mid-size loan program), Congress required borrowers to certify they were not involved in a bankruptcy proceeding, but in another section of the same Act (the Paycheck Protection Program), Congress chose not to require borrowers to certify that they were not involved in a bankruptcy proceeding.

By promulgating the Supplemental Rule, the SBA Administrator disqualified chapter 11 debtors from the Paycheck Protection Program, thereby denying an entire class of small businesses the very relief Congress intended to provide. Excluding chapter 11 debtors from the Paycheck Protection Program conflicts with Congress' intent in enacting the CARES Act. More important, doing so violates the CARES Act's plain language. The SBA Administrator therefore exceeded her authority when she promulgated the Supplemental Rule.

### b.   The Supplemental Rule is arbitrary and capricious.

Even if the SBA Administrator hadn't exceeded her authority when she promulgated the Supplemental Rule, the Supplemental Rule is still arbitrary and capricious. To be sure, the scope of review under the "arbitrary and capricious" standard is narrow.[88] This Court is mindful that it is not to substitute its own judgment for the SBA Administrator's judgment.[89]

Rather, in reviewing whether agency action is "arbitrary and capricious," this Court is limited to considering whether the SBA Administrator considered the relevant factors when promulgating the Supplemental Rule and whether her decision to exclude chapter 11 debtors from the Paycheck Protection Program was a clear

---

[88] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[89] *Id.*; *see also Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (citing *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43).

error of judgment.[90] Under this standard of review, the Supplemental Rule is "arbitrary and capricious" if:

- the SBA Administrator relied on factors that Congress did not intend her to consider;

- the SBA Administrator failed to consider an important aspect of the problem;

- the SBA Administrator's explanation for her decision runs counter to the evidence before the agency; or

- the SBA Administrator's explanation is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Here, the SBA Administrator's decision to exclude chapter 11 debtors from the Paycheck Protection Program is based on her determination that "debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans."[91] Putting aside that the basis for the SBA Administrator's determination is unclear, the Court concludes that she relied on factors Congress had not intended her to consider and failed to consider important aspects of the problem—not to mention her decision is counter to the evidence before the SBA.

---

[90] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("In reviewing [an agency's] explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974)).

[91] Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorization, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23,451 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121).

### i.   Congress did not intend for the SBA Administrator to focus on collectability.

The SBA Administrator relies on 15 U.S.C. § 636(a)(6) as a talisman to ward off any claim she exceeded her statutory authority. Section 636(a)(6) mandates that "[a]ll loans made under this subsection shall be of such sound value or so secured as to reasonably reassure repayment."[92] Because § 636(a)(6) requires loans to be of "sound value," the SBA Administrator insists she is authorized to disqualify chapter 11 debtors from the Paycheck Protection Program.[93]

But that argument ignores the very nature of the Paycheck Protection Program. Under the Paycheck Protection Program, PPP Loans are structured so that they don't have to be repaid. For a loan to be forgiven, all a borrower has to do is use the loan proceeds for payroll or mortgage interest, lease, or utility payments. Because PPP Loans are designed to be forgiven, Congress did not intend for the SBA Administrator to focus on collectability.

In fact, Congress delineated the two "underwriting" factors SBA lenders (who are exercising authority delegated from the SBA Administrator to make and approve loans) should consider when making PPP Loans. Neither factor has anything to do with collectability—much less whether a borrower is in bankruptcy. By taking into

---

[92] 15 U.S.C. § 636(a)(6).

[93] Adv. Doc. No. 11 at 25.

account a borrower's status as a chapter 11 debtor, the SBA Administrator has considered a factor Congress did not intend her to consider.

One final note: it's hard not to notice the SBA talking out of both sides of its mouth when it comes to its obligations under § 636(a)(6). On the one hand, the SBA tries to convince the Court that the Paycheck Protection Program's generous loan forgiveness features has done nothing to displace § 636(a)(6)'s general mandate to ensure loans made under § 7(a) of the Small Business Act, where the Paycheck Protection Program is housed, are of sound value. On the other hand, the SBA Administrator has excused SBA lenders from complying with 13 C.F.R. § 120.150, which enumerates the factors the SBA considers to ensure that any loan made under § 7(a) is of "sound value."[94] In reality, the SBA Administrator's reliance on § 636(a)(6) is an after-the-fact justification for an arbitrary and capricious rule.

### ii. The SBA Administrator failed to consider protections afforded by the chapter 11 bankruptcy process.

Not only did the SBA Administrator consider factors she shouldn't have, she also failed to consider factors she should have. Recall that the Supplemental Rule is premised entirely on the SBA Administrator's determination that debtors pose an unacceptably high risk of using PPP Loan proceeds for noncovered expenses, as well as an unacceptably high risk of nonpayment if the PPP Loan is not forgiven. Yet, in

---

[94] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 C.F.R. 20,811, 20,812 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

making that determination, the SBA Administrator failed to consider an important aspect of the problem: how chapter 11 bankruptcy functions.

Begin with the policy behind chapter 11 bankruptcy. The policy of chapter 11 is to provide a forum where troubled businesses can rehabilitate.[95] "Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize or sell its business as a going concern rather than simply to liquidate a troubled business."[96] Continued operation of a business is preferable to liquidation not only because it preserves going-concern value, but because it "can save the jobs of employees and the tax base of communities, and generally reduce the upheaval that can result from termination of a business."[97] The SBA Administrator failed to consider that chapter 11 bankruptcy and the Paycheck Protection Program share the same policy goal: keeping American workers employed and paid.

Now let's turn to specific Bankruptcy Code provisions that would eliminate the "unacceptably high risk" that a chapter 11 debtor would use PPP Loan proceeds for noncovered expenses. As a starting point, Bankruptcy Code § 364 bars a debtor

---

[95] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984); *see also In re Paris Indus. Corp.*, 106 B.R. 339, 341 (Bankr. D. Maine 1989) ("The Bankruptcy Code embodies a governmental policy favoring reorganization and a fresh start.").

[96] 7 Collier on Bankruptcy ¶ 1100.01 (Matthew Bender & Co. 16th ed.).

[97] *Id.*

from borrowing money outside the ordinary course of business—such as obtaining a PPP Loan—without court approval.[98]

Before a bankruptcy court can allow a debtor to borrow money outside the ordinary course of business, the debtor must give notice to interested parties in the case, who have a right to object to the proposed financing.[99] If the bankruptcy court is inclined to allow the debtor to borrow money, it can impose conditions on the debtor doing so. In addition to restricting the debtor's use of the loan proceeds to paying expenses set forth in an approved budget, those conditions can also include requiring the chapter 11 debtor to disclose to the Court and creditors what the loan proceeds were used for.

What's more, on top of any narrowly tailored reporting requirements the court may impose when approving a postpetition loan, chapter 11 debtors in general are required to file monthly operating reports.[100] Those reports, which detail a debtor's receipts and disbursements, are scrubbed by skilled professionals at the U.S. Trustee's

---

[98] 11 U.S.C. § 364(b).

[99] *Id.* (providing that court may authorize postpetition financing "after notice and a hearing").

[100] 11 U.S.C. § 1106(a)(1); *see also* Fed. R. Bankr. P. 2015. Bankruptcy Code § 1106(a)(1) incorporates Bankruptcy Code § 704(a)(8), which requires a debtor in possession operating a business to file periodic reports and summaries of the business' operations, including a statement of receipts and disbursements. The monthly operating reports allow a bankruptcy court and parties in interest to ascertain (among other things) whether a debtor in possession is grossly mismanaging the bankruptcy estate, violating cash collateral or other court order, or engaging in unauthorized disposition of estate assets. Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11, 79 Fed. Reg. 66,659, 66,660 (Nov. 10, 2014) (to be codified at 28 C.F.R. pt. 58).

Office. And because they are filed electronically, the monthly operating reports can be scrutinized by creditors in the case.

So the SBA Administrator has failed to consider that by restricting a debtor's use of PPP Loan proceeds to covered expenses and subjecting the debtor's use of the funds to scrutiny by creditors and the U.S. Trustee, bankruptcy courts can reduce the risk that a chapter 11 debtor will use PPP Loan proceeds for noncovered expenses.

Last, consider the extra protections afforded to lenders who loan money to debtors postpetition, which greatly reduce the risk of nonpayment. If a bankruptcy court approves a debtor's postpetition financing motion, the lender is entitled to an administrative expense claim under Bankruptcy Code § 503(b)(1).[101] Administrative expense claims—such as one for a PPP Loan—must be paid in full by the effective date of confirmation. The SBA Administrator therefore failed to consider that the Bankruptcy Code would give priority to repayment of PPP Loans made to chapter 11 debtors (to the extend funds were used for noncovered expenses).

### iii.    The SBA's explanation runs counter to the evidence before the agency.

Imagine Gateway Radiology was not in chapter 11 bankruptcy. In that hypothetical world, Hypothetical Gateway Radiology would apply to the Credit Union for a PPP Loan by filling out a two-page application in which it would answer

---

[101] 11 U.S.C. § 364(b) ("The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense").

eight questions (none of which have to do with creditworthiness); disclose the number of employees it has, its average monthly payroll, and its loan request; and check a box indicating how it intends to use the funds (payroll, lease or mortgage interest, utilities, or other).

Hypothetical Gateway Radiology would have also had to certify that it was operating on February 15, 2020; it had employees for whom it was paying salaries and payroll taxes; it needs the loan because of the economic uncertainty caused by COVID-19; it will use the loan proceeds for covered expenses; it will provide documentation showing it used the loan for covered expenses; it understands the loan will be forgiven if it is used for covered expenses (though nonpayroll expenses can only account for 25% of the forgiven amount); and it has not and will not seek another PPP Loan.

After confirming receipt of the certifications, the information demonstrating Hypothetical Gateway Radiology had employees, and the dollar amount of Hypothetical Gateway Radiology's payroll, the Credit Union would have then approved the loan. In the hypothetical world, the Credit Union would have done no investigation of Hypothetical Gateway Radiology's creditworthiness, its ability to repay the loan, or what it intended to use the PPP Loan for.

And once the PPP Loan was approved, the Credit Union would not truly monitor how Hypothetical Gateway Radiology used the money. Instead, the Credit Union would rely on the carrot-and-stick approach Congress provided to ensure repayment: the carrot, of course, is that the loan will be forgiven if it is used for

covered expenses; the "stick" is that Hypothetical Gateway Radiology would have to repay the loan if it was not used for covered expenses.

Sure, Hypothetical Gateway Radiology would be required to provide the Credit Union documentation showing it used the loan proceeds for covered expenses. But the Credit Union would not need to verify the documentation so long as Hypothetical Gateway Radiology attested that it verified the payments it made were for eligible costs.[102]

Now let's see how that story is playing out in the real world, where Gateway Radiology is in chapter 11 bankruptcy. Unlike a non-debtor, who can take out a PPP Loan with little to no oversight, Gateway Radiology had to first ask for this Court's approval, even though the PPP Loan had already been approved.

In seeking this Court's approval, Gateway Radiology (like a typical debtor seeking a PPP Loan) had to attach a copy of its loan application, along with a proposed budget detailing how it intends to use the loan proceeds.[103] According to its budget, Gateway Radiology proposes to use $445,000 of the $527,710 in loan proceeds for payroll, while the remaining $82,710 will be used for rent, health insurance premiums, and utilities—all of which are covered expenses. Unlike

---

[102] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,815 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120) ("The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower.").

[103] Doc. No. 238; Adv. Doc. No. 3.

Hypothetical Gateway Radiology, whose certification that it would use the loan for covered expenses was given only a perfunctory review by the Credit Union, the real Gateway Radiology's intention to use the PPP Loan for covered expenses is scrutinized by creditors, the U.S. Trustee, and (most important) the Court.

If any creditor doubts that the loan will be used for covered expenses, it has the right to object to the proposed PPP Loan. Indeed, one creditor has already done so. Philips Healthcare, one of the major creditors in this case, contends that unless this Court determines that the proposed PPP Loan is eligible for loan forgiveness and will be used for covered expenses, the Court should deny the motion because Gateway Radiology hasn't showed why the funds are necessary or how they will be repaid.

In effect, Philips Healthcare has raised the same concerns the SBA Administrator raised in her Supplemental Rule. Philips Healthcare wants to make sure that the loan proceeds are used for covered expenses and, if not, that Gateway Radiology can repay the loan. Outside bankruptcy there would be no one to raise those issues. Because Gateway Radiology is in bankruptcy, however, this Court can consider and address both those concerns.

To ensure that the loan proceeds are used for covered expenses, the Court can (if it approves the loan) order Gateway Radiology to use the proceeds only for payroll, health insurance, rent, and utilities. The Court can also require Gateway Radiology to file reports with supporting documentation so the Court and interested parties can verify that Gateway Radiology is using the loan proceeds for covered

38

expenses. This would be in addition to the Debtor's monthly operating reports, which would also show what the loan proceeds were being used for.

Outside bankruptcy, the Credit Union could rely on Hypothetical Gateway Radiology's attestation that it used the proceeds for covered expenses. Because Gateway Radiology is in bankruptcy, however, there will be, as one court aptly put it, a hundred-eyed Argus watching how Gateway Radiology uses the money.[104]

What happens if the hundred-eyed Argus spots Gateway Radiology using the loan proceeds for noncovered expenses? Outside bankruptcy, there would be nothing anyone could do about it. The loan would simply be subject to repayment. Of course, there would be no way to know if Hypothetical Gateway Radiology could repay the loan since there was no underwriting. Because the real Gateway Radiology is in bankruptcy, the Court can take steps to minimize the amount that will not be forgiven and increase the chances that the unforgiven amounts are repaid.

The Court can minimize the amount that has to be repaid by turning off the spigot as soon as the proceeds start flowing out for noncovered expenses. Whereas outside bankruptcy, the "stick" to prevent a non-debtor from using a PPP Loan for noncovered expenses is that the money has to be repaid. Inside bankruptcy, the "stick" is not just that the loan has to be paid—the "stick" also includes possible contempt or other sanctions for violating a court order barring a debtor from using

---

[104] *In re Roman Catholic Church of Archdiocese of Santa Fe*, ___ B.R. ___, 2020 WL 2096113, at *6 (Bankr. D. N.M. May 1, 2020) ("In short, the chapter 11 bankruptcy system is a hundred-eyed Argus.").

PPP Loan proceeds for noncovered expenses. Putting that aside, once the amount that must be repaid has been minimized, the Court can increase the chances it will be repaid by according the amount owed administrative expense status, which means it gets paid before other unsecured claims.

Having compared the safeguards in place for PPP Loans made to a chapter 11 debtor with the lack of any similar safeguards for PPP Loans to non-debtors, the Court cannot find any rational connection between the evidence before the SBA and the SBA's Supplemental Rule. Quite the opposite: to the extent that the SBA Administrator was concerned about PPP Loans being used for noncovered expenses or not being repaid, her Supplemental Rule is "illogical on its own terms." When agency action is "illogical on its own terms," as is the case here, the agency action is arbitrary and capricious.[105]

### 2. Unless an injunction is issued, Gateway Radiology will suffer irreparable harm.

In its motion for temporary injunction, Gateway Radiology alleges that it has seen a 55 – 60% decrease in patient volume at its outpatient imaging, diagnostic, and interventional radiology center since the start of the COVID-19 pandemic; that it needs the PPP Loan to shore up its finances so that it can continue serving the

---

[105] *Am. Fed'n. of Gov't Emps. v. Fed. Labor Relations Auth.*, 470 F.3d 375, 381 (D.C. 2006).

community as a front-line medical services provider during the pandemic; and

without the PPP Loan, it may not survive as a going concern.[106]

The SBA suggests that such a "meager showing is purely speculative, and in no

way imminent."[107] The Court is unpersuaded that the harm is as speculative and

remote as the SBA cavalierly suggests. In any event, the SBA's argument is

misplaced: to prove irreparable harm, Gateway Radiology need not prove that it will

go out of business if it doesn't get the PPP Loan. To establish irreparable harm,

Gateway Radiology must show that remedies at law—such as money damages—are

inadequate.[108]

Here, Gateway Radiology cannot be compensated by money damages. Under

the Paycheck Protection Program, Gateway Radiology is eligible for more than

$500,000 in financing that is designed to—and almost certainly will be—forgiven.

But funding under the Paycheck Protection Program, as the SBA has acknowledged,

is "first-come, first-served."[109] If the Court does not enjoin the Supplemental Rule,

the funding allocated to Gateway Radiology will be used for a PPP Loan to another

borrower.

---

[106] Adv. Doc. No. 3 at ¶ 29(b).

[107] Adv. Doc. No. 11 at 28.

[108] *Council v. Dep't of Veterans Affairs*, 2010 WL 98984, at *3 (M.D. Fla. Jan. 6, 2010) (citing *Ebay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

[109] Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120).

By the time it is determined that debtors are eligible for PPP Loans, all the Paycheck Protection Program funding will be gone. And Gateway Radiology will not have access to another $500,000 in funding that basically functions like a grant. That is classic irreparable harm.

### 3. The harm Gateway Radiology will suffer if no injunction is issued far outweighs any harm the SBA will suffer if an injunction is issued.

In its opposition, the SBA Administrator does not bother arguing that the SBA will suffer any harm if the Court enjoins her from enforcing the Supplemental Rule—much less that any harm it will suffer will outweigh the harm Gateway Radiology will suffer if the Court does not enjoin her from enforcing the Supplemental Rule. Presumably that's because it's unlikely the SBA will suffer any harm.

Admittedly, the SBA has a theoretical risk of harm. If Gateway Radiology does not use the PPP Loan for covered expenses, the PPP Loan will not be forgiven, which means what is essentially a grant will convert to a loan. If Gateway Radiology is unable to repay any unforgiven amounts, the SBA will be on the hook for the unpaid balance (which, theoretically, could be the entire $527,710). That risk, however, can be mitigated—basically to zero.

As the Court has already pointed out, it must first approve the PPP Loan. As part of the approval process, creditors and the U.S. Trustee have an opportunity to object if there is reason to believe Gateway Radiology will not use the PPP Loan

proceeds for covered expenses or if Gateway Radiology does not have the ability to repay the loan in the unlikely event it is not forgiven. To ensure that Gateway Radiology uses the PPP Loan for covered expenses, the Court can order Gateway Radiology to restrict its use of funds to covered expenses. And to increase the likelihood that any unforgiven amount will be repaid, the Court can award the Credit Union an administrative expense for any noncovered expenses. All of this will be overseen by the hundred-eyed Argus.

Thus, it's unlikely the SBA will suffer any harm. To the extent it does, that harm would be far outweighed by the harm Gateway Radiology will suffer if the Court does not enjoin the SBA from enforcing the Supplemental Rule (at least to the extent it disqualifies Gateway Radiology from the Paycheck Protection Program).

### 4.    Enjoining the SBA Administrator from disqualifying debtors from the Paycheck Protection Program will further Congress' objective in passing the CARES Act.

The SBA contends that enjoining the Supplemental Rule would disserve the public interest because the proposed injunction would: (1) short-circuit the rapidly evolving political and administrative landscape in response to COVID-19; (2) substitute Gateway Radiology's preferred policy for the SBA's stated policy; and (3) "throw a wrench into policymakers' evolving responses to COVID-19."[110]

---

[110] Doc. No. 11 at 29 – 30.

Throw a wrench into policymakers' evolving responses? It's hard not to be flabbergasted by the SBA Administrator's (pardon the banal expression) "through the looking glass" approach to promoting the public interest: in what world does disqualifying an entire class of troubled small businesses—perhaps those who need it the most—from obtaining grants to pay employees so their workers don't lose their jobs somehow promote the public interest, but ensuring that the $349 billion in relief flows to those who need it the most constitute "throwing a wrench" into Congress' response to COVID-19?

Congress passed the CARES Act "[t]o provide emergency assistance . . . for individuals, families, and businesses affected by the 2020 coronavirus pandemic."[111] In doing so, Congress created the Paycheck Protection Program, which basically provides $349 billion in grants so small businesses can pay their employees, and made sure as many small businesses were eligible for the grants as possible. By enjoining the Supplemental Rule, at least to the extent it disqualifies Gateway Radiology from the Paycheck Protection Program, the injunction would be promoting the public interest by giving effect to Congress' intent. Far from throwing a wrench into Congress' response to COVID-19, the Court would be preventing the SBA from inexplicably doing so.

---

[111] Coronavirus Aid, Relief, and Economic Security Act, S. 3548, 116th Cong. (2020).

## III.  CONCLUSION

"When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one."[112] It is up to this Court to ensure that the SBA Administrator has cleared that bar by engaging in reasoned decision-making."[113]

The SBA Administrator's decision-making here was anything but reasoned. Although Congress chose to require mid-size businesses to certify they were not in bankruptcy to participate in the mid-size loan program, it chose not to impose a similar requirement on small businesses wanting to participate in the Paycheck Protection Program.

The SBA Administrator concedes that when Congress knows how to say something but chooses not to, its silence is controlling."[114] But rather than treating Congress' silence as controlling, the SBA treats it as a dog whistle to exclude chapter 11 debtors from the Paycheck Protection Program because of the supposed unacceptably high risk that PPP Loans will be not be forgiven or collectable.

Any reasonable person would see that Congress was not concerned about collectability. PPP Loans are designed to be forgiven, which is why Congress and the

---

[112] *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

[113] *Id.* at 53 ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.")

[114] *CBS Inc. v. PrimteTime24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (internal quotations omitted) (quoting *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000)).

SBA have dispensed with traditional underwriting requirements. And in any event, the chapter 11 process makes it more—not less—likely chapter 11 debtors would use PPP Loans for covered expenses, in which case the loans would be forgiven. Thus, the SBA Administrator's explanation for the Supplemental Rule is contrary to the evidence before her.

Although the bar for agency action is not a high one, the SBA Administrator failed to clear it here. This Court will therefore enjoin the SBA Administrator from enforcing the Supplemental Rule to the extent it disqualifies Gateway Radiology from participating in the Paycheck Protection Program.

---

Attorney Joel Aresty is directed to serve a copy of this Memorandum Opinion on interested parties who are non-CM/ECF users and file a proof of service within three days of entry of this Memorandum Opinion.

---

**Joel M. Aresty, Esq.**
**Joel M. Aresty P.A.**
*Counsel for the Debtor*

**Christopher J. Emden**
*Counsel for Jovita Carranza,*
*in her capacity as*
*Administrator for the U.S. Small*
*Business Administration*